IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SHARON BAUER, et al., | * |
| Plaintiffs, | * |
| v. | * Crim. No. **PJM 20-1212** |
| MARC ELRICH, et al., | * |
| Defendants. | * |

## MEMORANDUM OPINION

Sharon Bauer and Richard Jurgena are Montgomery County, Maryland taxpayers who seek to bar County Executive Marc Elrich and County Department of Health and Human Services (DHHS) Director Raymond Crowel, in their official capacities, from implementing the County's Emergency Assistance Relief Payment Program (EARP), which they argue provides financial assistance to "unlawfully present aliens," in violation of 8 U.S.C. § 1621.

The matter is before the Court on Plaintiffs' Motion for Temporary Restraining Order. ECF No. 12.[1] At the Court's request, Defendants filed a brief Response in Opposition. ECF No. 17. On May 15, 2020, the Court heard Oral Argument from counsel via video conference. *See* ECF No. 19.

For the following reasons, Plaintiffs' Motion for Temporary Restraining Order is **DENIED**, on the condition that Montgomery County preserve at least twenty-five percent (25%) of as yet undistributed EARP funds, pending further order of the Court.[2]

---

[1] This Motion and the suit as a whole were originally filed in the Circuit Court of Montgomery County. *See* ECF No. 1. Defendants were served on May 13, 2020 and promptly removed the case to this Court the same day. *Id.*

[2] On May 15, 2020, the Court ordered an expedited briefing schedule to facilitate the prompt resolution of this matter on the merits. ECF No. 20.

1

## I.

On April 27, 2020, Montgomery County announced the creation of the EARP to provide one-time emergency assistance checks to county residents not eligible for federal COVID-19 stimulus funds or state benefits and whose income is less than 50% the federal poverty level.[3] As the County Council for Montgomery County described it, COVID-19:

> has resulted in the immediate loss of income for many households as businesses have been required to close and people have been told to stay home. This creates a financial crisis for many County residents, and it may not be addressed through financial assistance provided by the federal or State government.

ECF No. 17-1 (Resolution 19-439). The program appears to have been initially funded with approximately $5 million. *Id.*[4] However, on April 30, 2020, to "address the expected demand on those resources," the Council appropriated an additional $5 million. *Id.* In total, then, the County has appropriated $10 million for the EARP. *See* ECF No. 22.[5]

The mechanics of the program are as follows:

It distributes direct payments of $500 to a single adult, $1,000 to a family with a child, and an additional $150 to a family for each additional child, up to $1,450 total.[6] To qualify, an individual or family must (1) not be eligible to file Federal or State taxes, (2) not have filed nor be eligible to receive unemployment, (3) have an annual income below 50% of the federal poverty level, and (4) be a Montgomery County resident. *Id.*

---

[3] *See* Montgomery County, Press Release, "Montgomery County to Provide One-Time Emergency Assistance Relief Payment Checks to Low-Income Residents Not Receiving Federal Benefits," available at https://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail.aspx?Item_ID=25235 (Apr. 27, 2020) (hereinafter "Apr. 27, 2020 Press Release").

[4] Although not confirmed by the parties at Oral Argument, the County Council appears to have appropriated these funds pursuant to Resolution 19-411.

[5] At Oral Argument, both parties understood that the County had appropriated $5 million for the EARP. *See* Transcript of Oral Argument at 4, 34, 39 (May 15, 2020); *see also* ECF No. 12-1, p.1; ECF No. 17, p. 5. However, immediately following the hearing, Plaintiffs filed a notice with the Court stating that the County had appropriated $10 million for the program. ECF No. 22.

[6] *See* Montgomery County, Department of Health and Human Services, *COVID-19: Emergency Assistance Relief Payment (EARP)*, https://www.montgomerycountymd.gov/HHS/RightNav/Coronavirus_EARP.html (last visited May 25, 2020) (hereinafter "EARP Website").

The County Department of Health and Human Services, which administers the program, will be implementing it in three phases. *Id.* In Phase 1, which Defendants report is now complete, approximately $1 million was distributed to eligible residents who were existing enrollees in the County's Care for Kids program.[7] *Id.* Phase 2 has either recently begun or is set to begin imminently.[8] In this phase, non-profit organizations will collaborate with the County to identify individuals eligible to receive EARP payments. In Phase 3, as to which no specific timetable has been identified, residents may apply directly to DHHS for EARP funds. *Id.* Defendants anticipate that the full $10 million appropriation will be distributed by the first week of June 2020. *See* ECF No. 22; Transcript of Oral Argument at 5 (May 15, 2020) (ECF No. 21).

Plaintiffs ask the Court, before the money is depleted, to issue a Temporary Restraining Order blocking the County's distribution of EARP funds to "unlawfully present aliens." *See* ECF No. 12.

## II.

To obtain a temporary restraining order enjoining the County's implementation of the EARP, Plaintiffs must make a clear showing that (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm; (3) the balance of equities favors their position; and (4) the relief they seek is in the public interest. *See Winter v. Natural resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated and remanded on other grounds*, 559 U.S. 1089 (2010). "Each of these four factors must be satisfied." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d

---

[7] According to the County's website, Care for Kids "is a health care program that provides access to health care services for uninsured children in Montgomery County." Montgomery County, Department of Health and Human Services, "Medical Care for Uninsured Children (Care for Kids),"https://www.montgomerycountymd.gov/HHS-Program/Program.aspx?id=PHS/PHSMedCareforUninsChildrenCareForKids-P1703.html (last visited May 25, 2020).

[8] *See* EARP Website.

353, 366 (4th Cir. 2019); *The Real Truth About Obama*, 575 F.3d at 346. However, "[i]n exercising their sound discretion, courts of equity should pay *particular regard* for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (*quoting Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)) (emphasis added).

Courts are cautioned to "not impose an injunction lightly," *Cantley v. W.V. Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014), since "it is an extraordinary remedy involving the exercise of a very far-reaching power" that "is to be applied only in the limited circumstances which clearly demand it," *id.* (*quoting Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc)).

With these standards in mind, the Court considers Plaintiffs' Motion.

**A. Likelihood of Success on the Merits**

Plaintiffs assert that the EARP will provide financial assistance to unlawfully present aliens in violation of 8 U.S.C. § 1621. Indeed, as they see it, the program's eligibility criteria appear designed so that unlawfully present aliens will be the primary recipients of the cash payments. *See* ECF No. 12, p. 3.

Subsection (a) of § 1621 states that, generally, unlawfully present aliens are "not eligible for any State or local public benefit." 8 U.S.C. § 1621(a); *see also Mayor and City Council of Baltimore v. Trump*, 416 F.Supp.3d 452, 498 (D. Md. 2019) ("Section 1621 provides that immigrants who lack lawful status are not eligible for any State or local public benefit").[9] Subsection (c) broadly defines a "State or local public benefit" to include "any grant, contract, loan…

---

[9] The full text of 8 U.S.C. § 1621(a) reads: "Notwithstanding any other provision of law and except as provided in subsections (b) and (d), an alien who is not (1) a qualified alien (as defined in section 1641 of this title), (2) a nonimmigrant under the Immigration and Nationality Act [8 U.S.C. § 1101 et seq.], or (3) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C. § 1182(d)(5)] for less than one year, is not eligible for any State or local public benefit (as defined in subsection (c))."

4

retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government." 8 U.S.C. § 1621(c)(1)(A)-(B).

Defendants do not argue that the EARP is excluded from the definition of "State or local public benefit." 8 U.S.C. § 1621(c). It is hard to see how it could be. Nor have Defendants asserted that the program fits within one of the enumerated exceptions listed in 8 U.S.C. § 1621(b), which include: "[a]ssistance for health care items and services that are necessary for the treatment of an emergency medical condition", "[s]hort-term, non-cash, in-kind emergency disaster relief," "[p]ublic health assistance for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases," and certain "[p]rograms, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General…" 8 U.S.C. § 1621(b).

Notably, although several of 8 U.S.C. § 1621(b)'s exceptions pertain to public health emergencies, none appear to permit direct cash assistance.

Instead, Defendants' assert that the EARP meets the requirements of subsection (d) of the section to the effect that:

> A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.

8 U.S.C. § 1621(d); *see also Texas v. U.S.*, 809 F.3d 134, 148-49 (5th Cir. 2015), *aff'd*, 136 S.Ct. 906 (2016) ("Unlawfully present aliens are generally not eligible to receive… state and local public benefits unless the state otherwise provides").

5

The parties agree that the Maryland General Assembly has had no direct role whatsoever in the EARP. In fact, the County's resolutions make no mention of any state authorization. *See* ECF No. 17-1; n. 4, *supra*. The County's own press release describes the initiative as "based on actions by County Executive Marc Elrich and the County Council."[10]

Defendants claim that the resolutions passed by the County Council nonetheless meet the criteria of 8 U.S.C. § 1621(d) because, in approving them, the Council was acting pursuant to authority delegated to it by the General Assembly. Their argument is based on the interplay of Maryland's Home Rule Amendment, Article XI-A of the Maryland Constitution, and the Express Powers Act, Md. Local Gov't Code Ann. § 10-206, which they submit authorize county councils to approve legislation that "may aid in maintaining the peace, good government, health, and welfare of the county." The Council, they say, was tantamount to the General Assembly when it funded the EARP. Oral Argument Tr. at 15-16.

This argument is certainly open to challenge. Maryland's Home Rule Amendment instructs that county councils "shall have full power to enact *local laws*." Md. Const., art. XI-A, § 3 (emphasis added). The Express Powers Act clarifies that "[a] County council may pass any ordinance, resolution, or bylaw *not inconsistent with State law*," drawing a clear distinction between local and State law. Md. Local Gov't Code Ann. § 10-206(a) (emphasis added). The Maryland Court of Appeals has said that a "local law... applies to only one subdivision... and pertains only to a subject of local importance." *Tyma v. Montgomery County*, 801 A.2d 148, 154 (Md. 2002). One indication of the local nature of the EARP is that it expressly limits eligibility to "Montgomery County residents" who "provide a valid Montgomery County address."[11]

---

[10] *See* Apr. 27, 2020 Press Release.
[11] *See* EARP Website.

Moreover, it seems that Congress well understood the distinction between State and local law when it enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 § 411, Pub. L. No. 104-193 § 411, 110 Stat. 2268, codified in part as 8 U.S.C. § 1621. Subsection (d) of 8 U.S.C. § 1621 provides for possible eligibility of a "*State or local* public benefit... only through the enactment of a *State* law." 8 U.S.C. § 1621(d) (emphasis added). Importantly, legislative history confirms that Congress did not intend for local laws to satisfy subsection (d)'s exception:

> Laws, ordinances, or executive orders passed by county, city or other local officials will not allow those entities to provide benefits to illegal aliens. Only the affirmative enactment of a law by a State legislature and signed by the Governor after the date of enactment of this Act, that references this provision, will meet the requirements of this section.

H.R. Rep. 104-725, 2d Sess., p. 383 (1996). Many courts across the country have embraced this analysis. *See Florida Bd. of Bar Examiners re Question as to Whether Undocumented Immigrants are Eligible for Admission to the Fla. Bar*, 134 So. 3d 432, 435 (Fla. 2014) ("The plain language of the statute and case law indicate that the phrase 'enactment of a State law' requires a state legislature to address this appropriations-related issue and pass legislation, which the governor must either approve or permit to become the law of the State"); *Martinez v. Regents of U. of Cal.*, 241 P.3d 855 (Cal. 2010) (finding a statute passed by the State Legislature that qualified unlawful aliens for in-state college tuition complied with 8 U.S.C. § 1621(d)'s requirements); *Kaider v. Hamos*, 975 N.E.2d 667 (Ill. App. Ct. 2012).

In the alternative, Defendants assert that 8 U.S.C. § 1621(d) unconstitutionally violates the anti-commandeering doctrine derived from the 10th Amendment of the Bill of Rights.[12] *See* ECF

---

[12] The anti-commandeering doctrine under the Tenth Amendment holds that the Federal Government cannot force States to adopt or to enforce federal law in ways that go to the heart of their independent sovereignty. The doctrine has been referred to in recent cases involving legalized sports betting, sanctuary cities, and state regulation of marijuana. *See, e.g., Murphy v. National Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1475 (2018) ("The

No. 17. This argument raises complex issues of evolving law. For present purposes what is important is that is not suited for ruling in connection with an expedited motion for a Temporary Restraining Order. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) ("The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward") (citation omitted); *Roe v. Dep't of Defense*, 947 F.3d 207, 231 (4th Cir. 2020). The 10th Amendment issue, in addition to any challenges to Plaintiffs' standing,[13] will be adjudicated when the Court considers the full merits of the case. *See* ECF No. 20 (Court Order setting expedited briefing schedule).

Based on an analysis of the federal statute alone, the Court concludes that Plaintiffs have demonstrated a strong likelihood of success on the merits.

That said, however, as the Supreme Court has made clear, an injunction "does not follow from success on the merits as a matter of course," *Winter*, 555 U.S. at 32 (*citing Romero-Barcelo*, 456 U.S. at 313 ("a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law"), and courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *id.* at 24; *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005). The Court, therefore, turns to the other factors relevant to the issuance of a Temporary Restraining Order.

### B. Irreparable Harm

It seems clear that Plaintiffs would be irreparably harmed in the absence of a court order enjoining Defendants' continued implementation of the EARP insofar as unlawfully present aliens

---

anticommandeering doctrine... is simply the expression of a fundamental structural decision incorporated into the Constitution, i.e., the decision to withhold from Congress the power to issue orders directly to the States").

[13] Defendants have not argued, either in their Response or at Oral Argument, that Plaintiffs lack standing. Therefore, for the purposes of ruling on the Motion for Temporary Restraining Order, the Court assumes Plaintiffs have satisfied the applicable standard for standing.

may be beneficiaries. At least $1 million has already been disbursed, presumably some of which went to unlawfully present aliens, and the County expects to distribute the remaining balance of program's $10 million by the first week of June, again with presumably additional payments going to unlawfully present aliens. *See* ECF No. 22; Oral Argument Tr. at 4-5. Thus, even if Plaintiffs were to ultimately prevail on the merits, there is no expectation that funds could somehow be recuperated by taxpayers once disbursed. *See also Mountain Valley Pipeline*, 918 F.3d at 366 ("economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation").

### C. Balance of Equities and Public Interest

The remaining factors – the balance of equities and the public interest – merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roe v. Dep't of Defense*, 947 F.3d at 230.

As far as the equities are concerned, Plaintiffs assert that the continued expenditure of EARP funds will not only lead to the pay-out of unrecoverable funds; it will result in an increase in their County taxes in general. While, by the parties' own estimates, Plaintiffs Bauer and Jurgena would only see modest increases in their property taxes, perhaps a one-year increase of $20 to $30 each, that suffices to qualify for cognizable harm.[14]

For their part, Defendants describe the EARP's financial assistance as "life-saving." Oral Argument Tr. at 24. This may well be true. The COVID-19 pandemic is a genuine "public health crisis" that poses "dire health risks." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020) (Ginsburg, J., dissenting). The public health emergency has brought on a

---

[14] At Oral Argument, the parties estimated the potential fiscal impact on each plaintiff to be approximately $11.50. *See* Oral Argument Tr. at 24. However, that estimate was based upon the understanding that the County appropriated $5 million for the EARP, not the $10 million Defendants have since informed the Court. *See* ECF No. 22.

severe economic crisis. *See, e.g.*, Heather Long and Andrew Van Dam, *U.S. Unemployment Rate Soars to 14.7 percent, the Worst Since the Depression Era*, The Washington Post, May 8, 2020. The program's target beneficiaries – whose annual incomes are below 50% of the federal poverty level – were almost certainly experiencing severe economic hardship even prior to the coronavirus pandemic. But with abundant certainty, the pandemic has exacerbated their financial straits.[15] Without the monetary assistance of the EARP, Defendants argue, eligible residents will be left to struggle to maintain their homes, to purchase necessities, and to put food on their tables. *See* Oral Argument Tr. at 21.

Plaintiffs say they are not unsympathetic to the plight of all, but assert that there are mechanisms other than direct cash payments through which the County could provide assistance to potential EARP beneficiaries, assistance that would comply with 8 U.S.C. § 1621. They identify at least one non-profit organization operating within Montgomery County said to be already providing cash assistance to those in need, the implication being that the $500 per individual and up to $1,450 per family of the EARP could be matched by this and similar organizations. *See* Oral Argument Tr. at 27. In sum, without minimizing the scope of the pandemic, Plaintiffs suggest that the potential impact to EARP-eligible residents is not as dire as Defendants claim.

The Court believes that, for its intended beneficiaries (however numerous the class of unlawfully present residents may be), the financial assistance is of critical importance. The pandemic has caused undeniable hardship, while at the same time it is hardly guaranteed that those eligible to benefit from the EARP could, at least in the short term, receive comparable relief through other sources. The Court finds that the balance of equities tips in Defendants' favor.

---

[15] *See, e.g.*, Chris Wilson, *These Graphs Show How COVID-19 Is Ravaging New York City's Low-Income Neighborhoods*, Time, Apr. 15, 2020 (available at https://time.com/5821212/coronavirus-low-income-communities/).

Insofar as the public interest is concerned, Plaintiffs go beyond arguing the relative financial impact of the EARP on taxpayers if the program is permitted to go forward and on the intended beneficiaries if it is blocked. Plaintiffs' broader argument is that by providing funds to unlawfully present aliens, County officials are failing to adhere to federal law. *See, e.g.*, Oral Argument Tr. at 24-25. Such adherence is obviously of fundamental importance. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

But there is an overarching problem that makes it difficult to evaluate the countervailing considerations to Plaintiffs' abstract rule of law argument.

The problem is that Defendants have not provided nor can they (so they say) provide even a rough estimate of the number of unlawfully present aliens who are eligible for the cash payments of the EARP. *See* Oral Argument Tr. at 32-33, 37. To date, the County has never asked EARP applicants their legal status, nor indeed does it seem inclined to do so. *Id*. at 5. Further complicating matters is the challenge of defining precisely who meets the statutory definition of an "unlawfully present alien." *See id*. at 20; 8 U.S.C. § 1621(a); *see also* 8 U.S.C. § 1641(b); Ava Ayers, *Immigrants and Public Benefits: What Must States and Localities Provide? (And When Do They Have a Choice?)*, Gov't L. Ctr. at Albany L. Sch., Jul. 31, 2018, at 2. In sum, it remains conjectural as to how many Montgomery County residents would in fact be impacted by enjoining the EARP in whole or in part. Given that circumstance, and having deferred consideration of Defendants' Constitutional argument, *supra*, the Court is unable to conclude with any degree of confidence that the public interest in upholding the rule of law would better served temporarily by granting the Motion or denying it.[16]

---

[16] In their pleadings on the merits, the parties are requested to indicate specifically who they would or would not consider an "unlawfully present alien" and how, if Plaintiffs prevail on the merits, the County should undertake to determine who is or is not in that category.

To recap:

While Plaintiffs have demonstrated that they are likely to succeed on the merits and that they will suffer irreparable harm absent an injunction, they have not shown that the balance of equities or the public interest favor their cause. It cannot be said, therefore, that Plaintiffs have made a "clear showing" that they are entitled to a temporary restraining order. *Winter*, 555 U.S. at 22 (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

This, however, does not end the inquiry.

### III.

"[A] court should mold its decree to meet the exigencies of the particular case." *Roe v. Dep't of Defense*, 947 F.3d at 231. Indeed, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Id.* (*quoting Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). Because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the Court needs to ensure that an ultimate resolution on the merits will be possible. *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, in the present case it seems only sensible that a reasonable quantity of money remaining in the EARP's coffers should be reserved pending a decision of the case on the merits.

Plaintiffs do not seek the dissolution of the EARP in its entirety, only prohibition of the distribution of EARP funds to unlawfully present aliens. But since it is clear that at least some eligible residents will not be unlawfully present aliens as defined by 8 U.S.C. § 1621, a substantial quantity of funds must remain available for Defendants' continued implementation of the program.

n/a
n/a
n/a

With this in mind and to ensure that that an appropriate amount of money remains undistributed so that the case may be effectively resolved after full airing of the issues on the merits, the Court will require Defendants to set aside twenty-five percent (25%) of the funds remaining in the program. Accordingly, Plaintiffs' Motion for Temporary Restraining Order is **DENIED**, on the condition that Defendants preserve at least twenty-five percent (25%) of the remaining EARP funds, pending further order of the Court.

A separate Order will **ISSUE**.

/s/
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**May 29, 2020**