**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

SHARON BAUER, *et al.*,

               Plaintiffs,

     v.

MARC ELRICH, in his official capacity as
Montgomery County Executive, *et al.*,

               Defendants.

Civ. Action No. 8:20-cv-01212-PJM

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

LEGAL STANDARD...............................................................................................................4

ARGUMENT ........................................................................................................................5

I.      Plaintiffs Have No Private Right Of Action To Enforce § 1621 .............................5

II.     The EARP Program Complies With § 1621 ...................................................10

III.    Section 1621 Contravenes The Tenth Amendment ....................................15

CONCLUSION.....................................................................................................................19

## **TABLE OF AUTHORITIES**

### CASES

**Page(s)**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)...............................................................................................5

*Allen v. Cooper,*
    140 S. Ct. 994 (2020)..........................................................................................16

*American Academy of Pediatrics v. FDA,*
    379 F. Supp. 3d 461 (D. Md. 2019) .....................................................................5

*Anne Arundel County v. Bell,*
    442 Md. 539, 113 A.3d 639 (Md. 2015)............................................................6, 7

*Arizona v. United States,*
    567 U.S. 387 (2012)............................................................................................17

*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
    135 S. Ct. 2652 (2015)........................................................................................15

*Astra USA, Inc. v. Santa Clara County,*
    563 U.S. 110 (2011)............................................................................................10

*Beck v. McDonald,*
    848 F.3d 262 (4th Cir. 2017) ...............................................................................4

*Bell v. Hood,*
    327 U.S. 678 (1946)............................................................................................10

*Bernal v. Fainter,*
    467 U.S. 216 (1984)............................................................................................17

*Berry v. City of Muskogee,*
    900 F.2d 1489 (10th Cir. 1990) ...........................................................................9

*Cannon v. University of Chicago,*
    441 U.S. 677 (1979).............................................................................................5

*Chamber of Commerce of United States v. Whiting,*
    563 U.S. 582 (2011)............................................................................................17

*City of Columbus v. Ours Garage & Wrecker Service, Inc.,*
    536 U.S. 424 (2002)..........................................................................2, 11, 12, 14

*Clawson v. FedEx Ground Package System, Inc.,*
    451 F. Supp. 2d 731 (D. Md. 2006) ...................................................................15

*Comcast Corp. v. National Association of African American-Owned Media*,
  140 S. Ct. 1009 (2020).............................................................................................8

*County Council for Montgomery County v. Investors Funding Corp.*,
  270 Md. 403, 312 A.2d 225 (Md. 1973).................................................................11

*Cox v. Duke Energy, Inc.*,
  876 F.3d 625 (4th Cir. 2017) .................................................................................10

*Dandridge v. Williams*,
  397 U.S. 471 (1970)...............................................................................................18

*Day v. Bond*,
  500 F.3d 1127 (10th Cir. 2007) ...............................................................................5

*DeCanas v. Bica*,
  424 U.S. 351 (1976)...............................................................................................17

*Felder v. Casey*,
  487 U.S. 131 (1988).................................................................................................9

*Florida Board of Bar Examiners re Question as to Whether Undocumented
  Immigrants are Eligible for Admission to the Florida Bar*,
  134 So. 3d 432 (Fla. 2014).....................................................................................13

*Florida Prepaid Postsecondary Education Expense Board v. College Savings
  Bank*, 527 U.S. 627 (1999)....................................................................................16

*Floyd v. Mayor of Baltimore*,
  463 Md. 226, 205 A.3d 928 (Md. 2019)...................................................................6

*Gonzaga University v. Doe*,
  536 U.S. 273 (2002).................................................................................................5

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)...........................................................................................2, 15

*Haywood v. Drown*,
  556 U.S. 729 (2009).................................................................................................9

*Howlett v. Rose*,
  496 U.S. 356 (1990).................................................................................................8

*In re Commonwealth's Motion to Appoint Counsel*,
  790 F.3d 457 (3d Cir. 2015).....................................................................................9

*Jaco v. Bloechle*,
  739 F.2d 239 (6th Cir. 1984) ...................................................................................9

*Jones v. Chapman*,
No. 14-cv-2627-ELH, 2017 WL 1546432 (D. Md. Apr. 28, 2017).....................................4

*Kaider v. Hamos*,
975 N.E.2d 667 (Ill. App. Ct. 2012) ....................................................................13

*Kofa v. INS*,
60 F.3d 1084 (4th Cir. 1995) ...............................................................................14

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..............................................................................................7

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..............................................................................................4

*Martinez v. Regents of University of California*,
241 P.3d 855 (Cal. 2010) ....................................................................................13

*Mastin v. Ditech Financial, LLC*,
No. 17-cv-368, 2018 WL 524871 (E.D. Va. Jan. 23, 2018)................................10

*Monell v. Department of Social Services City of New York*,
436 U.S. 658 (1978).............................................................................................8

*Montgomery County v. Managed Care Innovations, LLC*,
261 F. Supp. 3d 567 (D. Md. 2017)......................................................................4

*Moor v. Alameda County*,
411 U.S. 693 (1973).............................................................................................8

*Murphy v. NCAA*,
138 S. Ct. 1461 (2018)................................................................2, 15, 16, 18, 19

*New York v. United States*,
505 U.S. 144 (1992).............................................................................................16

*Printz v. United States*,
521 U.S. 898 (1997).............................................................................................16

*State Center v. Lexington Charles Limited Partnership*,
92 A.3d 400 (Md. 2014) ....................................................................................6, 7

*Turner v. Thomas*,
930 F.3d 640 (4th Cir. 2019) ..............................................................................15

*Vales v. Preciado*,
No. 05-cv-3110-CBD, 2012 WL 115425 (D. Md. Jan. 13, 2012).......................4

*Wisconsin Public Intervenor v. Mortier*,
501 U.S. 597 (1991)......................................................................................11, 12

## CONSTITUTIONS, STATUTES, AND RULES

U.S. Const. art. I, § 8, cl. 1...........................................................................17

8 U.S.C.
§ 1621................................................................................................... *passim*
§ 1624..........................................................................................................13
§ 1625..........................................................................................................13
§ 1641..........................................................................................................19

42 U.S.C.
§ 1983.................................................................................................8, 9, 10
§ 1988............................................................................................................8

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136,
134 Stat. 281 (2020)....................................................................................3

Mont. Cty. Code 1965, ch. 49, art. I, § 49-5 (modifying 1912 Md. Laws, ch. 790,
§ 464)..........................................................................................................12

Fed. R. Civ. P. 56.................................................................................................4

## LEGISLATIVE MATERIALS

H.B. 546, 2020 Md. Laws, ch. 245 (enacted May 8, 2020)..............................12

H.B. 805, 2020 Md. Laws, ch. 331 (enacted May 8, 2020)..............................12

## INTRODUCTION

Plaintiffs seek to curtail Montgomery County's Emergency Assistance Relief Payment ("EARP") Program, which provides emergency financial assistance to County residents who face dire economic need and who cannot participate in federal and state assistance programs. Plaintiffs assert a single claim, which is that the EARP Program violates 8 U.S.C. § 1621. Plaintiffs are not entitled to summary judgment on that count.

Plaintiffs' claim fails at the outset because there is no private right of action to enforce § 1621. Plaintiffs cannot bypass that critical deficiency in their case by manufacturing a state-law cause of action. Whether a federal statute is privately enforceable is up to Congress, not state courts, and Congress has determined that § 1621 is not to be enforced by private parties. Maryland law cannot be used to thwart that determination, and in any event, Maryland law does not allow Plaintiffs to do so. Plaintiffs invoke the Maryland doctrine of taxpayer standing, but that rule merely enables taxpayers, in certain circumstances, to enforce Maryland state law in Maryland state courts without showing that a state statute grants a private right of action. No Maryland decision of which Defendants are aware has extended that doctrine to allow a private suit to enforce a federal statute that Congress has determined should not be privately enforceable.

On the merits, Plaintiffs fail to establish that the EARP Program violates § 1621. The Program is lawful because it is an enactment of "State law" that "affirmatively provides for [undocumented immigrants'] eligibility" for local benefits. 8 U.S.C. § 1621(d).[1] Plaintiffs' cramped reading of that statute—under which "State law" can refer only to a statute enacted by the state legislature and signed into law by the governor—runs afoul of Supreme Court precedent

---

[1] This brief uses the terms "undocumented immigrant" or "undocumented person" to refer to the group of people encompassed by the statutory term "alien who is not lawfully present in the United States." 8 U.S.C. § 1621(d).

1

holding that, absent a clear textual indication to the contrary, "State law" includes law made by a State's political subdivisions pursuant to delegated authority.  *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 428-429 (2002).  And although law made by the Montgomery County Council is "local" in the sense that it applies only locally rather than statewide, that does not deprive it of its status as "State law" within the meaning of the Maryland Constitution.  Indeed, the Maryland General Assembly passes laws that apply only locally in specific non-charter counties (or within even smaller geographical areas), which are undoubtedly "State laws" despite their lack of statewide reach.  When exercising legislative power under the Maryland Constitution's home-rule provisions and the Express Powers Act, which implements home rule, the Montgomery County Council exercises the same powers as those previously exercised by the General Assembly, and its enactments have the force of state law.

Finally, Plaintiffs fail to show that § 1621 satisfies the Tenth Amendment.  On the contrary, to the extent that § 1621 commands that States and their political subdivisions may provide benefits to their residents only through an enactment of the state legislature signed into law by the governor containing specific wording dictated by Congress, § 1621 does violate the Constitution.  It does so both by directly intruding on States' sovereign authority to structure their governments as they see fit, *see Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), and by commandeering States' lawmaking functions by prohibiting them from enacting benefits programs unless they do so in the precise manner Congress has specified (and by prohibiting States' political subdivisions from legislating such a program altogether), *see Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018).

Plaintiffs' motion for summary judgment should be denied in its entirety.

## BACKGROUND[2]

Beginning in late March 2020, the Montgomery County Council responded to the economic devastation caused by the COVID-19 crisis—which has led with startling speed to unemployment unrivaled since the Great Depression—by enacting two special appropriations to fund the EARP Program with $10 million from the County's General Fund Reserves.  That program offers one-time financial assistance payments of $500 to $1,450 per family to County residents who do not qualify for relief payments under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), or Maryland unemployment insurance.  Only the most economically vulnerable County residents qualify for EARP Program assistance:  Recipients' annual income must be at or below 50 percent of the 2020 federal poverty level, which is just $6,380 per year for a single-person household, and $13,100 per year for a family of four.  Decl. of Marc Hansen in Support of Def. Mot., Ex. F (Dkt. 28-9).

Plaintiffs brought suit on May 11, 2020.  Their complaint alleges that the EARP Program violates 8 U.S.C. § 1621, which provides that certain noncitizens are not "eligible for any State or local public benefit" with certain exceptions unless a "State law" enacted after August 22, 1996 "affirmatively provides" for such eligibility.  *See* Compl. ¶ 9 (Dkt. 1-3).  Plaintiffs' sole claim is that, because the EARP Program payments "are local public benefits as defined by 8 U.S.C. § 1621(c)," and the Maryland General Assembly has not enacted a statute authorizing the program, the program violates 8 U.S.C. §1621(a).  *Id.* ¶¶ 21-23.

---

[2] Defendants' memorandum in support of summary judgment offers a more comprehensive recitation of the factual and procedural background.  *See* Def. Mem. 3-7 (Dkt. 28-2).  Here, Defendants offer a summary only of additional factual matters relevant to Plaintiffs' motion.

Plaintiffs seek declaratory relief and a permanent injunction prohibiting Defendants,

Montgomery County Executive Marc Elrich and Montgomery County Department of Health and

Human Services Director Raymond Crowel, from "providing cash payments to unlawfully

present aliens," as well as attorney's fees and costs.  *See* Compl. ¶ 26 & p. 6.  Plaintiffs moved

for a temporary restraining order to prohibit payments under the EARP Program, Dkt. 12, which

the Court denied in an order entered May 29, 2020, while requiring Defendants to preserve at

least 25% of EARP funds pending further order of the court, Dkt. 34.[3]

## LEGAL STANDARD

Summary judgment is proper when the moving party demonstrates "that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see Montgomery Cty. v. Managed Care Innovations, LLC*, 261 F.

Supp. 3d 567, 573 (D. Md. 2017).  "When considering cross-motions for summary judgment,

---

[3] Plaintiffs assert standing to sue based solely on their status as County taxpayers. Compl. ¶ 5.  Rather than verifying their status by sworn declarations, Plaintiffs have supported their claim of taxpayer standing by citing only an unauthenticated County webpage showing property tax bills for two parcels of real property.  *See* Pl. Mem. 6 & n.6 (Dkt. 29-1).  But at summary judgment, a plaintiff must establish standing by "set[ting] forth by affidavit or other evidence specific facts."  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  *See* Fed. R. Civ. P. 56(c)(1).  Defendants assume that Plaintiffs can provide the necessary declarations to substantiate their standing (and thus found Plaintiffs' proposed stipulation, which went far beyond that subject, unnecessary and overbroad, *cf.* Pl. Mem. 2 n.1), and agree they should be permitted to supplement the record for that purpose under Fed. R. Civ. P. 56(e)(1).

More generally, Plaintiffs have submitted no declaration authenticating any documents cited in their brief, and instead request blanket judicial notice of all "facts set forth in [Plaintiffs'] memorandum."  Pl. Mem. 1 & n.1.  But a party moving for summary judgment must authenticate any supporting documents and attach them to an affidavit that meets the requirements of Rule 56(e).  *Vales v. Preciado*, No. 05-cv-3110-CBD, 2012 WL 115425, at *4 (D. Md. Jan. 13, 2012).  Although such evidence need "not *be* in admissible form," Plaintiffs must "identif[y] facts that *could* be put in admissible form."  *Jones v. Chapman*, No. 14-cv-2627-ELH, 2017 WL 1546432, at *3 (D. Md. Apr. 28, 2017).  Plaintiffs cannot obtain summary judgment in their favor without authenticating the documents they assert demonstrate the absence of a material factual dispute.

'the court must view each motion in a light most favorable to the non-movant.'" *American Academy of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 474 (D. Md. 2019).

## ARGUMENT

### I.   PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION TO ENFORCE § 1621

Plaintiffs' complaint asserts a single claim challenging Defendants' supposed "violat[ion]" of § 1621.  Compl. ¶ 23.  As explained in Defendants' motion for summary judgment, § 1621 is not privately enforceable, and summary judgment should be granted to Defendants for that reason alone.  Def. Mem. 9-14; *Alexander v. Sandoval*, 532 U.S. 275, 286-287 (2001); *see also Day v. Bond*, 500 F.3d 1127, 1139 (10th Cir. 2007).

Plaintiffs do not dispute that § 1621 contains no private right of action.[4]  Instead, hoping to sidestep that fundamental flaw in their case, Plaintiffs now assert (Pl. Mem. 4) that they possess a "common law claim" under Maryland law that allows them to enforce § 1621 despite Congress's intent that § 1621 should not be privately enforceable.

That is wrong as a matter of both Maryland and federal law.  As to Maryland law, Plaintiffs identify no Maryland cause of action that would enable them to enforce § 1621—nor could they, because Maryland law does not supply one.  Plaintiffs rely on *State Center, LLC v. Lexington Charles Limited Partnership* for the proposition that, as long as they bring suit on

---

[4]  Plaintiffs cite no "rights-creating language" in § 1621, *Alexander*, 532 U.S. at 288, that is "phrased in terms of the persons benefited," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692, n.13 (1979)).  To the contrary, they contend that § 1621 "does no more than inform certain aliens that they are not eligible for certain types of benefits."  Pl. Mem. 18.  In fact the statute does more, by compelling States (or, as here, political subdivisions) to engage in lawmaking if they wish to render noncitizens eligible for such benefits.  *See* 8 U.S.C. § 1621(d); *infra* pp. 18-19.  But Plaintiffs are right to concede that § 1621 does nothing to confer a private right of action.  Indeed, the absence of any mention of taxpayers dooms any argument that Congress implicitly intended to grant them a right of action to enforce § 1621.  Def. Mem. 12-13.

behalf of all County taxpayers, they "do not require [a] private cause[] of action" to enforce

§ 1621.  Pl. Mem. 4 (quoting *State Ctr. v. Lexington Charles, Ltd. P'ship*, 438 Md. 451, 542, 92

A.3d 400, 454 (Md. 2014)).  But that case and the others on which Plaintiffs rely merely

permitted taxpayers to sue to enforce Maryland law in Maryland court as a matter of Maryland

standing doctrine without separately establishing their right of action under the relevant

Maryland statute.  *See Floyd v. Mayor of Baltimore*, 463 Md. 226, 235-236, 205 A.3d 928, 934

(Md. 2019) (challenging Baltimore zoning ordinance for failure to comply with municipal law

procedural requirements); *Anne Arundel Cty. v. Bell*, 442 Md. 539, 584, 113 A.3d 639, 666 (Md.

2015) (challenging county rezoning ordinance as illegal "spot zoning" under state statute); *State

Ctr.*, 92 A.3d at 452 (challenging award of no-bid contract under Maryland Procurement Code).

But Plaintiffs cite no case—nor have Defendants located one—in which any Maryland court

extended Maryland's taxpayer standing doctrine to allow a plaintiff to enforce any federal

statute—much less a federal statute that Congress has not made privately enforceable.

     And the case law strongly suggests that the Maryland Court of Appeals would reject that

unprecedented extension of its doctrine.  Even with respect to suits to enforce a state statute, the

Maryland Court of Appeals has recognized that "the General Assembly [can] pre-empt[] this

common law right" to sue.  *State Ctr.*, 92 A.3d at 454.  In other words, Maryland law recognizes

that the taxpayer standing doctrine cannot supply a cause of action if the legislature has

foreclosed private enforcement.  Given the Maryland Court of Appeals' deference to the General

Assembly's authority to define who may enforce a state statute, it is all the more doubtful that a

Maryland court would allow a private suit to enforce a federal law where Congress has chosen

not to allow private enforcement.

Moreover, as the Maryland Court of Appeals made clear in *State Center*, "taxpayer standing" is, as its name suggests, a state *standing* doctrine. 92 A.3d at 428. The Maryland Court of Appeals has exempted certain taxpayers from establishing a private right of action only as part of Maryland's "common law standing doctrine." *Anne Arundel Cty.*, 113 A.3d at 661; *see also id.* ("[T]axpayer standing provides the 'cause of action' standing sufficient for justiciability."). Unlike in federal court, where "the concepts of jurisdiction, standing, cause of action, and remedy [a]re treated separately, … the appellate courts in Maryland have adopted the 'cause-of-action' approach, which groups the traditionally distinct concepts of standing and cause of action into a single analytical construct, labeled as 'standing.'" *State Ctr.*, 92 A.3d at 428-430.

Under federal law, in contrast, standing and the existence of a private right of action are separate requirements, and a plaintiff must satisfy both. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Plaintiffs may have standing under Article III, *see* Def. Mem. 9, but they cannot opt out of the distinct requirement that they demonstrate "a cause of action under the statute"—in other words, that they "fall[] within the class of plaintiffs whom Congress has authorized to sue under [§ 1621]"—a question that must be analyzed under the federal courts' private right of action jurisprudence. *Lexmark*, 572 U.S. at 128. And as Defendants have shown and Plaintiffs do not dispute, § 1621 contains neither an express nor an implied private right of action. Def. Mem. 9-14.

In any event, even if Maryland law did purport to allow such a suit, Plaintiffs' contention would fail as a matter of federal law because it is up to Congress, not the state courts, to decide whether a federal statute is privately enforceable. A State cannot manufacture a right of action to enforce a federal statute where, as here, Congress has not created one.

Federal statutes are creatures of Congress's making, in the exercise of its enumerated powers. Therefore, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created *by Congress*." *Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020) (emphasis added). Although state courts may not refuse to entertain federal statutory claims that Congress has created, they also may not expand the scope of liability under such federal claims beyond what Congress has delineated in a federal statute—including (as Plaintiffs advocate) by "borrow[ing] entire causes of action from state law." *Moor v. Alameda Cty.*, 411 U.S. 693, 701 (1973).

Thus, in *Moor*, the Supreme Court rejected California plaintiffs' effort to extend liability under 42 U.S.C. § 1983 to Alameda County for a deputy sheriff's violation of the plaintiffs' civil rights. Although California law had waived municipal immunity from suit, the Supreme Court held that state law could not expand the remedies available under § 1983, which at that time had been construed to exclude state political subdivisions from liability. *See Moor*, 411 U.S. at 699-700.[5] Indeed, the Court reached that conclusion even though Congress expressly provided that § 1983 "shall be exercised and enforced in conformity with … the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil ... cause is held," 42 U.S.C. § 1988, explaining that Congress nonetheless had not "authorize[d] the wholesale importation into federal law of state causes of action—not even one purportedly designed for the protection of federal civil rights," *Moor*, 411 U.S. at 699-704.

---

[5] The Court subsequently overruled its holding that municipalities may not be liable under § 1983, *see Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 693 (1978), but its holding in *Moor*—that States may not displace limitations on federal statutory liability—remains good law. *See Howlett v. Rose*, 496 U.S. 356, 376 (1990) (explaining that, under *Moor*, "[a] State may not, by statute or common law, create a cause of action under § 1983 against an entity whom Congress has not subjected to liability," and explaining that *Monell* held only that municipalities may be defendants to § 1983 suits).

As courts applying *Moor* have explained, allowing States to create state-law causes of action to expand federal statutory rights would subvert Congress's intent and yield an inconsistent patchwork that would thwart the uniform application of federal law.  *See Berry v. City of Muskogee*, 900 F.2d 1489, 1506 (10th Cir. 1990) (declining to "permit[] the state to define the scope and extent of recovery" under § 1983 by allowing Oklahoma wrongful death action, which would allow recovery for loss of consortium and other damages not available under other States' laws); *see also Jaco v. Bloechle*, 739 F.2d 239, 243 n.5 (6th Cir. 1984) (explaining that Ohio's wrongful death statute could not be used to enforce § 1983 because, rather than just "regulating the survival of the decedent's legal claims," it "creates a cause of action").[6]

The existence and scope of a private right of action to enforce a federal statute is thus a question for Congress.  And where Congress has elected not to authorize private suits to enforce a federal statute, state courts are not free to displace that choice.  The cause of action Plaintiffs purport to assert under Maryland law—even assuming Maryland courts would allow it, which they would not, *see supra* pp. 5-7—would alter the federal statute by creating a right of action that does not exist under § 1621, in violation of the Supremacy Clause.  *See In re Commonwealth's Mot. to Appoint Counsel¸* 790 F.3d 457, 475-477 (3d Cir. 2015) (purported state-law cause of action to enforce federal statute was preempted where Congress did not

---

[6] Conversely, in *Haywood v. Drown*, 556 U.S. 729 (2009), the Supreme Court struck down a New York law that purported to divest state courts of jurisdiction over § 1983 suits seeking money damages from correction officers.  Holding the statute invalid under the Supremacy Clause of the U.S. Constitution, the Court explained that, "although States retain substantial leeway to establish the contours of their judicial systems, they lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies."  *Id.* at 736; *see also Felder v. Casey*, 487 U.S. 131, 142 (1988) (striking down Wisconsin notice-of-claim law that imposed an "exhaustion requirement" on § 1983 claims).

provide for any such private enforcement, as such enforcement would "interfere with the regulatory scheme that Congress has created"); *cf. Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 118 (2011) (permitting a county to enforce a federal statute through third-party contract beneficiary theory would "render[] meaningless" the "absence of a private right of action to enforce" the statute). Plaintiffs' case therefore fails at the threshold, and this Court need proceed no further.[7]

## II.   THE EARP PROGRAM COMPLIES WITH § 1621

As Defendants explained in their motion for summary judgment, the EARP program complies with § 1621(d) because it was established pursuant to a "State law" that "affirmatively provides" for eligibility of undocumented immigrants. *See* Def. Mem. 15-21.

Plaintiffs rely on generic canons of statutory construction to argue that "State law" refers solely to "an enactment by a state legislature." Pl. Mem. 12. That rigid interpretation—which would exclude every other valid form of state lawmaking—should be rejected. The phrase "State law" is presumptively broad, and encompasses other forms of lawmaking a State might adopt or authorize. *See, e.g.*, *Cox v. Duke Energy, Inc.*, 876 F.3d 625, 632 (4th Cir. 2017) (using the phrase "under color of state law" to describe 42 U.S.C. § 1983's inclusion of individuals acting "under color of any statute, ordinance, regulation, custom, or usage, of any State"). That includes lawmaking by a State's political subdivisions pursuant to delegated authority. As the

---

[7] The absence of a private right of action to enforce § 1621 does not deprive this Court of jurisdiction. Plaintiffs are correct that their suit "arises under" federal law in that it *asserts* a right to enforce § 1621, even if the Court ultimately concludes that right does not exist. "For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits not a dismissal for want of jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682 (1946). Plaintiffs' failure to identify a private right of action therefore requires judgment against Plaintiffs on the merits, not remand to state court. *See Mastin v. Ditech Fin., LLC*, No. 17-cv-368, 2018 WL 524871, at *5 (E.D. Va. Jan. 23, 2018).

Supreme Court has explained, States have broad authority to delegate to their political subdivisions the authority to make State law, and statutory references to the "State" are therefore presumed to include such political subdivisions absent a "clear statement to the contrary." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 428-429 (2002); *see also Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-608 (1991) (States have "absolute discretion" to create "local 'governmental units … as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them.'").  Plaintiffs thus have the relevant interpretive principle backwards:  Because § 1621 contains no such clear statement, its reference to "State law" should be read to include laws enacted by political subdivisions exercising state-delegated authority.

The Montgomery County Council exercised precisely that authority when it appropriated funds for the EARP Program.  Maryland's Home Rule Amendment and enabling statutes delegate State lawmaking authority to charter counties like Montgomery County, and the laws enacted by the County Council are an exercise of that "share[d]" state legislative power.  *See County Council for Montgomery Cty. v. Investors Funding Corp.*, 270 Md. 403, 418, 312 A.2d 225, 234 (Md. 1972).  The EARP Program was thus authorized by "State law."

Plaintiffs dispute that understanding of Maryland law, contending (Pl. Mem. 9) that Montgomery County "cannot enact State laws" under the Maryland Constitution.  But Plaintiffs misapprehend the lawmaking authority that the State has delegated to the County.  It is true, as the Court noted in denying Plaintiffs' TRO motion, Op. 6 (Dkt. 33), that Montgomery County makes "local" laws, in the sense that its laws pertain only to Montgomery County—the County cannot govern the City of Baltimore, for example.  But a law's applicability to only one geographical area of the State does not preclude it from being a "State law."  Indeed, before the

adoption of Maryland's Home Rule Amendment, the Maryland General Assembly routinely enacted state laws that applied only in specific geographic areas. *See, e.g.*, Mont. Cty. Code 1965, ch. 49, art. I, § 49-5 (modifying 1912 Md. Laws, ch. 790, § 464). Those laws were "local," but constituted and carried the force of state law. In the Home Rule Amendment and implementing legislation, the General Assembly simply transferred its authority to make such laws to the charter counties, *see* Def. Mem. 17-18, which now exercise the "portion of state power" to make locally applicable state law that "the State, under its own constitution and laws, ch[ose] to delegate" to them. *City of Columbus*, 536 U.S. at 428-429.[8]

Plaintiffs contend that § 1621's reference to "State law" should be read to exclude law made by political subdivisions, relying on an inference from Congress's use of the phrase "State or political subdivision" in other sections of Title 8. But that inference is weak at best and certainly does not supply the "clear statement" necessary to overturn the fundamental background presumption, rooted in structural principles of federalism, that, as far as federal law is concerned, States have complete discretion to delegate their lawmaking authority to political subdivisions. For Congress to interfere in the way that a State allocates its internal lawmaking functions would be a grave matter, and the Court should not reach that conclusion absent an unmistakable showing that Congress had done so. *See Mortier*, 501 U.S. at 607 ("Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority.").

---

[8] Even since the Home Rule Amendment, the General Assembly can still enact "local" laws on certain subjects, which are plainly "State law." *See, e.g.*, H.B. 805, 2020 Md. Laws, ch. 331 (enacted May 8, 2020) (exempting a building used for agritourism in Montgomery County from a certain building permit requirement, among other things); H.B. 546, 2020 Md. Laws, ch. 245 (enacted May 8, 2020) (requiring the members of the Board of Community College Trustees for Anne Arundel County to reside in Anne Arundel County, among other things).

Here, no such showing is possible.  The other provisions on which Plaintiffs rely are insufficient to overturn the presumption that political subdivisions may and do enact "State law." Those provisions merely acknowledge that both States and their subdivisions administer benefits programs; they do not speak to the division of authority between States and their subdivisions. Section 1624 authorizes a "State or political subdivision of a State" to "prohibit or otherwise limit or restrict the eligibility of aliens or classes of aliens for programs of general cash public assistance furnished under the law of the State or a political subdivision of a State."  8 U.S.C. § 1624(a).  That provision allows States and their political subdivisions to add further eligibility restrictions to their own state or local benefits programs in addition to those already excluded from "State or local public benefit[s]" under § 1621(a).  It says nothing about which entities may enact "State law" rendering excluded noncitizens eligible under § 1621(d).  Likewise, § 1625 allows a "State or political subdivision of a State" to "require an applicant for State and local public benefits (as defined in section 1621(c)) to provide proof of eligibility."  *Id.* § 1625.  Like § 1624, § 1625 permits State and local governments to demand proof of eligibility when administering their own State or local benefits programs as contemplated by § 1621(a) and (c), and has no bearing on the definition of "State law" under § 1621(d).  If anything, § 1625's cross-reference to § 1621 indicates that Congress expected that local government entities would be operating their own benefits programs and could make law with respect to those programs.[9]

---

[9] In its order denying the temporary restraining order, the Court cited *Florida Board of Bar Examiners re Question as to Whether Undocumented Immigrants are Eligible for Admission to the Florida Bar*, 134 So. 3d 432 (Fla. 2014).  But the Florida court did not decide whether § 1621(d)'s reference to "State law" can include law enacted by a political subdivision (or consider what authority political subdivisions have under Maryland law), and the court's reference to Florida's legislative process was dicta that has no bearing here.

Similarly, in both *Martinez v. Regents of University of California*, 241 P.3d 855 (Cal. 2010), and *Kaider v. Hamos*, 975 N.E.2d 667 (Ill. App. Ct. 2012), the courts merely determined

Nor is the legislative history dispositive.  As the Fourth Circuit has admonished, "[t]he text of the statute, and not the private intent of the legislators, is the law."  *Kofa v. INS*, 60 F.3d 1084, 1088 (4th Cir. 1995)).  And as explained above, for a federal statute to prohibit a State's delegation of authority to its political subdivision, there must, at a minimum, be a "clear statement" of that intent within the statutory text.  *See City of Columbus*, 536 U.S. at 428-429. For example, the statute at issue in *City of Columbus* contained wording similar to § 1621:  It used the words "State [or] political subdivision of a State" in one section, while referring only to the "authority of the State" in the provision at issue.  *Id.* at 431.  But that did not constitute a "clear statement" of Congress's intent to disrupt the States' delegation of authority to municipalities.  The Supreme Court therefore construed the latter statutory language to include laws made by political subdivisions, thereby "preserv[ing] … the traditional prerogative of the States to delegate their authority to their constituent parts."  *Id.* at 429; *see also id.* at 439-440 ("Absent a basis more reliable than statutory language insufficient to demonstrate a 'clear and manifest purpose' to the contrary, federal courts should resist attribution to Congress of a design to disturb a State's decision on the division of authority between the State's central and local units over [issues of local concern].").

This Court should similarly interpret § 1621(d)'s reference to "State law" to include laws enacted by political subdivisions pursuant to state-delegated authority.  The EARP Program was enacted by such a law, and thus complies with § 1621(d).[10]

that state laws passed by state legislatures satisfied § 1621(d).  They did not address the force of laws made by political subdivisions.

[10] Plaintiffs have not contested that the appropriations resolutions authorizing the EARP Program were "enactment[s]" that "affirmatively provide[]" for undocumented immigrants' eligibility for benefits.  *See* Pl. Mem. 14 n.8.  They have therefore waived any argument that those requirements were not met, and they accordingly cannot be awarded summary judgment on

**III.    SECTION 1621 CONTRAVENES THE TENTH AMENDMENT**

As Defendants have explained (Pl. Mem. 21-29), even if the Court were to conclude that the EARP Program violates § 1621, it should nonetheless deny Plaintiffs' motion and grant summary judgment to Defendants because § 1621, as interpreted by Plaintiffs and applied to the EARP Program, would violate constitutional principles of federalism.  That is so for two reasons: First, read as Plaintiffs suggest, § 1621 attempts to restructure the basic political structures that many States, including Maryland, have established for legislating in the area of public benefits, violating the principle that "States retain autonomy to establish their own governmental processes."  *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015); *see Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Second, § 1621 violates the Tenth Amendment's anticommandeering principle by purporting to regulate States' enactment of public benefits programs, prohibiting States from doing so unless they comply with Congress's mandates.  *See Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018).  Plaintiffs make no argument on the first point, and their efforts to evade the second (Pl. Mem. 14-19) are unavailing.

Plaintiffs' primary argument is that the Tenth Amendment's limits on congressional authority do not apply or carry less potency here because Congress enacted § 1621 pursuant to its power to regulate immigration.  *See* Pl. Mem. 15-16 & n.10, 17-18.  That argument is flawed on multiple levels.  First, the source of Congress's enumerated authority to legislate is irrelevant to the Tenth Amendment analysis.  The principles of federalism on which cases like *Gregory v. Ashcroft* and *New York v. United States* turn do not depend on the particular grant of legislative

---

that ground.  *See Turner v. Thomas*, 930 F.3d 640, 643 n.1 (4th Cir. 2019) (finding a party waived an argument through "inattention to [the] claim on appeal, combined with his express statement to the district court" that he "dropped" it); *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

authority in Article I under which Congress has purported to legislate; rather, they are fundamental and structural limitations on congressional power, reflected in the Tenth Amendment, that apply regardless of which Article I power Congress happened to invoke.

The Supreme Court made exactly this point in *New York*, explaining that "Congress exercises its conferred powers subject to the limitations contained in the Constitution." *New York v. United States*, 505 U.S. 144, 156 (1992). "Thus, for example, under the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment." *Id.* The principles of federalism explicated in cases like *Gregory* and *New York*, the Court explained, are analogous, insofar as they impose limitations on congressional authority even where Congress purports to act pursuant to an enumerated power. *See id.* at 166-167; *see also Murphy*, 138 S. Ct. at 1476 ("The anticommandeering doctrine simply represents the recognition of this limit on congressional authority."); *Printz v. United States*, 521 U.S. 898, 923-924 (1997). The Supreme Court has made the same point in the context of the limitations imposed by the Eleventh Amendment on Congress's authority to abrogate state sovereign immunity; those limits apply regardless of which Article I power Congress has invoked. *See Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 636 (1999) (holding that "Congress may not abrogate state sovereign immunity pursuant to its Article I powers" regardless of which source of enumerated authority it invokes); *Allen v. Cooper*, 140 S. Ct. 994, 1001 (2020) (same). It is thus irrelevant to the Tenth Amendment analysis whether Congress legislates pursuant to its authority over immigration, its Commerce Clause authority, or any other authority enumerated in Article I; the same constitutional limitations apply under the Tenth Amendment. Here, as Defendants have explained, § 1621 contravenes those limitations.

16

Plaintiffs are also incorrect to suggest that § 1621 can be understood as an exercise of any "exclusive" authority Congress may possess over immigration or that the States have no authority in this area except as delegated by Congress.  Pl. Mem. 15-16 & n.10.  As the Supreme Court explained in *DeCanas v. Bica*, 424 U.S. 351 (1976), Congress's authority is exclusive only over matters at the core of its power to adopt "uniform Rule[s] of naturalization," U.S. Const. art. I, § 8, cl. 4—*i.e.*, to determine "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain," 424 U.S. at 355.  The EARP does not fall within the narrow scope of that exclusive power, as *De Canas* illustrates.

*De Canas* involved a California law regulating the employment of undocumented persons.  Although the federal government argued that the law was preempted, the Supreme Court rejected that argument, explaining that the "regulation of aliens" is not the same as the "regulation of immigration."  "[I]f all state regulation of aliens was ipso facto regulation of immigration," the Court explained, the vast bulk of its own immigration-preemption case law would have been unnecessary.  *De Canas*, 424 U.S. at 355.  Indeed, "even if such local regulation has some purely speculative and indirect impact on immigration, it does not thereby become a constitutionally prescribed regulation of immigration."  *Id.* at 355-356.  States therefore retain the authority to regulate certain conditions under which employers may hire undocumented persons, *see Chamber of Commerce of United States v. Whiting*, 563 U.S. 582, 587-588 (2011); *De Canas*, 424 U.S. at 356; to establish citizenship qualifications for certain public positions, *see Bernal v. Fainter*, 467 U.S. 216, 220 (1984); and, under some circumstances, to authorize State officers to check the immigration status of noncitizens, *see Arizona v. United States*, 567 U.S. 387, 412-413 (2012).  And the subject matter of § 1621—a State's determination of who may receive public benefits from the State's own fisc, and under

17

what circumstances—is an area in which state and local authority, not federal authority, is at its apogee, *see Dandridge v. Williams*, 397 U.S. 471, 485-486 (1970), and States retain that authority unless it is preempted by a valid federal law that "regulates the conduct of private actors, not the States."  *Murphy*, 138 S. Ct. at 1481.

Plaintiffs suggest that § 1621 does regulate private actors and that it "does not mandate any action by the States."  Pl. Mem. 18.  According to Plaintiffs, § 1621(a) "is a regulation of aliens, not a regulation of the States," and § 1621(d) "simply creates a process by which a State may—if it so chooses—provide specific benefits to unlawfully present aliens."  *Id.*  But that reading of § 1621 is backwards.  Like the statute at issue in *Murphy*, § 1621 does not regulate noncitizens directly, but rather regulates the States themselves; it tells the States what benefits they may or may not offer noncitizens and when and how they may or may not do so.  Section 1621 plainly does not "impose[] restrictions or confer[] rights" on undocumented persons. *Murphy*, 138 S. Ct. at 1480.  Section 1621 does not, for example, subject undocumented persons to any penalty for receiving public benefits; nor does it even state that their receipt of such benefits is unlawful.

Thus, for the same reasons as in *Murphy*, § 1621 is "best read" as a statute imposing a "federal restriction" on the States themselves, not noncitizens.  138 S. Ct. at 1479.  In *Murphy*, for example, the statute did not impose any penalties on individuals for acting or for failing to act:  "If a private citizen or company started a sports gambling operation[]"—the subject of the law at issue in *Murphy*—the statutory provision before the Court "would not be violated and would not provide any ground for a civil action by the Attorney General or any other party."  *Id.* at 1481.  The same is true here.  If a noncitizen obtains unauthorized public benefits from a State, he or she has not violated § 1621.  At most, the State has.  There is thus "no way to understand

[§ 1621] as anything other than a direct command to the States," which is "exactly what the anticommandeering rule does not allow." *Id.*

Plaintiffs finally suggest that, to the extent § 1621 "could be read to commandeer States to implement a federal immigration program, such reading should be rejected." Pl. Mem. 19 n.11. That is exactly right. To avoid having to hold § 1621 unconstitutional, the Court should construe § 1621 to accommodate any "State law" enacted through the State's ordinary principles and procedures for lawmaking, including authority delegated to political subdivisions, and not to unconstitutionally prohibit a State and its political subdivisions from taking necessary action to address a desperate need in the community.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for summary judgment in its entirety.[11]

Dated:  June 5, 2020                              Respectfully submitted,

                                                  /s/ Marc P. Hansen
                                                  Marc P. Hansen (#26524)
                                                  County Attorney
                                                  John P. Markovs (#7599)
                                                  Deputy County Attorney
                                                  101 Monroe Street, Third Floor
                                                  Rockville, MD  20850
                                                  (240) 777-6700
                                                  marc.hansen@montgomerycountymd.gov
                                                  john.markovs@montgomerycountymd.gov

---

[11] In footnote 16 of its order denying the temporary restraining order, this Court requested that the parties indicate "who they would or would not consider an 'unlawfully present alien'" and "how the County should undertake to determine who is or is not in that category." Section 1621 incorporates, among other things, the definition found at 8 U.S.C. § 1641 of "qualified alien[s]" entitled in certain circumstances to obtain public benefits. For other federal and state public benefits administered by the County, the County's Department of Health and Human Services requests information from applicants intended to establish that they are eligible to receive such benefits, including their immigration status.

Paul R.Q. Wolfson (*pro hac vice*)
Catherine M.A. Carroll (*pro hac vice*)
Alexandra Stewart (#19633)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
(202) 663-6000
paul.wolfson@wilmerhale.com
catherine.carroll@wilmerhale.com
alex.stewart@wilmerhale.com

*Counsel for Defendants*